## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JOHN R. STANLEY,**

      **Plaintiff,**

                                        **Civil Action 2:11-cv-00791**

**vs.**                                      **Judge Gregory L. Frost**

                                        **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Plaintiff, John R. Stanley, filed this action seeking review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of a final decision of the Commissioner of Social Security ("Commissioner") regarding his applications for social security disability insurance benefits and supplemental security income.  Plaintiff's applications alleged disability since January 14, 2002, due to diabetes, a heart condition, depression, seizures, and arthritis.  (R. at 222–24, 225–31, 240.)

After initial administrative denial of his claims, Plaintiff appeared and testified at two video hearings before an Administrative Law Judge ("ALJ") on November 5, 2009 and April 29, 2010.  (R. at 9–11, 29–32, 41–46, 53–54.)  Medical experts and vocational experts also testified at both hearings.  (R. at 12–28, 46–53, 54–58.)  On May 28, 2010, the ALJ issued his decision. He found that Plaintiff was not disabled prior to February 1, 2006; became disabled for a closed period from February 1, 2006 through April 1, 2009; and was no longer disabled beginning on

April 2, 2009 due to medical improvement.  (R. at 72.)  This decision became the final decision of the Commissioner when the Appeals Council denied review on July 13, 2011.  (R. at 1–4.)

Plaintiff thereafter timely commenced this civil action.  In his Statement of Errors, Plaintiff contends that the ALJ erred in finding that he experienced medical improvement as of April 2, 2009 and was no longer disabled.  Following the Commissioner's response in opposition, the matter is now ripe for decision.  For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff, who was twenty nine years old on the alleged disability onset date, has a ninth grade education.  (R. at 234, 247.)  At the time of the first administrative hearing on November 5, 2009, Plaintiff was thirty seven years old.  His past relevant work was as a excavator, dump truck operator, and supervisor for a small general labor work crew.  (R. at 241, 289–96.)

At the November 5, 2009 administrative hearing, Plaintiff testified that he "started getting ill" in 2001 and described his conditions as shortness of breath; a prior heart attack; frequent chest pain; constant pain in his arms and legs; diabetes; and seizures.  (R. at 9.)  He stated that his doctors had excused him from work since 2001.  (R. at 10.)

Plaintiff testified that he saw his doctors every three months for his diabetes.  (R. at 29.)  He indicated that he was compliant with his diet and medication, and took five shots a day.  (*Id.*)  He reported checking his blood sugar about three times a day.  (*Id.*)  His lowest reading was usually around 240 or 250 mg/dL.  (*Id.*)  He noted soreness in his arms and legs from the diabetes.  (*Id.*)  Plaintiff reported that he was always tired and became short of breath when

2

walking from one room to the next.  (R. at 29–30.)  Plaintiff further stated that he experienced chest pain once or twice a day.  (R. at 30.)  Finally, Plaintiff indicated that he was being treated for depression and had anger issues, but did not believe that his medication was helping.  (R. at 31.)

With regard to activities, Plaintiff testified that he was not able to do much work around the house or yard work because of shortness of breath.  (R. at 31.)  He indicated that he use to hunt and fish, but had not done these activities for a couple of years due to his physical condition.  (R. at 31–32.)  Plaintiff estimated that he could only stand for 15 or 20 minutes at a time because of leg pain.  (R. at 32.)  He noted that he took an hour nap every day.  (*Id.*)

At the April 29, 2010 administrative hearing, Plaintiff testified that he last worked in 2002 when he first got sick.   (R. at 41–42.)  He indicated that he lost his eye sight for a few months because of diabetes.  (R. at 42.)  He then reported having trouble breathing and that he "ended up having a heart attack."  (*Id.*)  Plaintiff asked his family doctor if he should return to work, and the doctor told him that he should not.  (*Id.*)  When asked why he would be unable to sit for six hours and stand for two hours in an eight-hour workday, Plaintiff stated that his legs would bother him.  (R. at 44.)  Plaintiff also indicated that his lower back bothers him when sitting.  (*Id.*)

As to housework, Plaintiff suggested that he does some light work, can stand for five to ten minutes, wash dishes, and occasionally sweep the floor.  (R. at 45.)  With regard to yard work, Plaintiff indicated that he would use a riding lawnmower for twenty to twenty-five minutes at a time.  (*Id.*)  Plaintiff testified that he went to the grocery store once in a while, but did not lift any of the bags.  (*Id.*)  According to Plaintiff, he drove two to three times a week.

(*Id.*)

### III. MEDICAL RECORDS[1]

A.      **Treatment Notes**

1.      **Prior to April 2, 2009**

February 11, 2006 treatment records from Riverside Methodist Hospital reflect that

Plaintiff had suffered a "recent myocardial infarction involving the inferior wall and diabetes

mellitus." (R. at 331.) Plaintiff was admitted to the hospital in mid-January 2006 for

angioplasty and stenting. (*Id.*) He complained of shortness of breath, chest pain, and extreme

fatigue. (*Id.*) Following testing, Plaintiff's doctor diagnosed him with dyspnea on exertion,

chest pain, atherosclerotic vascular disease, and diabetes with mild hyperglycemia. (R. at 332.)

Plaintiff began treating with primary care physician, Daniel Schlie, M.D., at least as early

as February 2006. In February 2006, Dr. Schlie noted that Plaintiff had received treatment for a

variety of conditions including diabetes, gastroesophageal reflux, depression, and seizure

disorder. (R. at 446.) At this time, Dr. Schlie reported that Plaintiff had been having trouble

controlling his blood sugar both at home and when hospitalized for his myocardial infarction.

(*Id.*) On February 24, 2006, Plaintiff experienced a sudden drop in his blood sugar and

developed a seizure. (R. at 445.) In April 2006, Dr. Schlie noted that Plaintiff's diabetes did not

appear to be very well controlled. (R. at 444.)

On May 5, 2006, Plaintiff was admitted again to Riverside Methodist Hospital with

_____

[1] Within his Statement of Errors, Plaintiff contends that the ALJ erred in finding medical improvement to Plaintiff's physical condition beginning April 2, 2009. Plaintiff does not appear to contend that the ALJ erred in assessing his mental impairments. Accordingly, the undersigned will focus on Plaintiff's physical condition in summarizing the record.

4

complaints of chest pain, nausea, vomiting, and abdominal pain.  (R. at 328–30.)  Plaintiff underwent a stress test that demonstrated a preserved ejection fraction and no ischemia.  (R. at 326.)  By May 15, 2006, Plaintiff's symptoms had improved and he was discharged with diagnoses of abdominal distention, chest discomfort, a history of coronary artery disease, diabetes mellitus, and seizure disorder.  (R. at 328–30.)

Dr. Schlie continued to opine that Plaintiff's diabetes was not well controlled in November 2006.  (R. at 441.)  Plaintiff's hemoglobin A1C was 8.2% at this time.[2]  (Id.)  He referred Plaintiff to a specialist.  (Id.)

On December 19, 2006, Plaintiff began treating with endocrinologist, Judy Lee, M.D., for management of his type 1 diabetes.  (R. at 352–55.)  Plaintiff reported that he checked his blood sugar three or four times a day, and that his readings ranged anywhere from 250 to 500 mg/dL. (R. at 352.)  Plaintiff denied hypoglycemia, symptoms of hyperglycemia, retinopathy, and nephropthy, but did report some symptoms of neuropathy.  (Id.)  Dr. Lee adjusted Plaintiff's insulin regimen.  (R. at 354.)  On December 20, 2006, Plaintiff's Hemoglobin A1C was 8.9%.

In January 2007, Dr. Lee noted that testing revealed that Plaintiff had insulin-deficient diabetes but not type 1 diabetes.  (R. at 350.)  Based on Plaintiff's reports of his fingerstick readings, which reached as high as the 300s, Dr. Lee concluded that Plaintiff had wide glycemic flux.  (Id.)  Dr. Lee again adjusted Plaintiff's diabetes medication regimen.  (R. at 350-51.)  In

---

[2]  The hemoglobin A1c test provides an average of a person's blood sugar control over a two to three month period.  "The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists." *Shedden v. Astrue*, No. 4:10–CV–2515, 2012 WL 760632, at *7 n.30 (M.D. Pa. Mar. 7, 2012) (citing American Diabetes Association, Estimated Average Glucose, http://www.diabetes.org/living-with-diabetes/treatmentand-care/blood-glucosecontrol/estimated-average-glucose.html ).

February 2007, Plaintiff told Dr. Schlie that he was "getting along pretty well." (R. at 440.) Plaintiff, however, continued to report sporadic sugar readings, reaching as high as 500 mg/dL. (*Id.*) Dr. Schlie advised Plaintiff that his tendency to go long periods of time without eating was not helping his diabetes control. (*Id.*) On February 28, 2007, Dr. Lee reported to Dr. Schlie that Plaintiff was experiencing hypoglycemia in the afternoons. (R. at 348.)

Plaintiff saw cardiologist Anne Albers, M.D., on May 17, 2007. (R. at 324–25.) Plaintiff indicated that he had been having chest pain for the past six months and was using nitroglycerin three times per week. (R. at 324.) Plaintiff also reported dyspnea, chronic leg swelling, palpitations when sitting, and dizziness. (*Id.*) Dr. Albers scheduled Plaintiff for a stress echo cardiogram to further assess the causes of his shortness of breath and chest pain. (R. at 325.) She restarted the medication Plaintiff had received when he was hospitalized in 2006. (*Id.*) Dr. Albers' notes also indicate that Plaintiff was struggling with high cholesterol. (*Id.*)

Plaintiff continued to visit Drs. Schlie and Lee for treatment throughout 2007. In May 2007, Dr. Schlie noted that Plaintiff's blood sugar was not well controlled, and suggested that Plaintiff had problems with compliance. (R. at 439.) Test results from May 24, 2007 reflect that Plaintiff's hemoglobin A1C was 10.1%. (R. at 357.) In August 2007, Plaintiff requested a statement from Dr. Schlie regarding his work ability. (R. at 438.) Dr. Schlie provided a statement indicating that Plaintiff was unable to work and that he anticipated disability to last approximately six months. (*Id.*) On August 21, 2007, Plaintiff told Dr. Lee that his finger stick readings were still consistently elevated. (R. at 344.) Dr. Lee indicated that Plaintiff's diabetes was still under poor control, and emphasized the need for diet compliance. (R. at 344–45.) In November 2007, Dr. Schlie noted mild sensory abnormalities in Plaintiff's feet upon

examination and a hemoglobin A1C of 11.3%. (R. at 437.) He opined that Plaintiff's diabetes was still not well controlled. (*Id.*) In December 2007, Dr. Schlie continued to indicate that Plaintiff's "major problem" was poorly controlled diabetes. (R. at 436.)

On November 19, 2007, Plaintiff was admitted to the Pike Community Hospital with vomiting and chest pain. (R. at 409.) His blood sugar was 638 mg/dL. (R. at 415.) The admitting impression was hyperglycemia, diabetic ketoacidosis, dehydration, and chest pain. (R. at 410.) Plaintiff was admitted to the intensive acre unit, but eventually transferred to the medicine/surgery unit. (R. at 412.) The hospital discharged Plaintiff on November 21, 2007 with diagnoses of probable acute gastritis; hyperlipidemia; diabetes mellitus type II; arteriosclerotic heart disease, status post percutaneous transluminal coronary angioplasty, with stent placement; history of seizures; hypertension; and gastroesophageal reflux disease. (R. at 415.)

In January 2008, Dr. Schlie opined, following examination, that while Plaintiff's diabetes was not well controlled, it was improving. (R. at 435.) On February 5, 2008, Dr. Lee noted that Plaintiff was experiencing two to three episodes of hypoglycemia during the night, but otherwise was doing better with his blood sugar readings. (R. at 504.) Dr. Lee altered Plaintiff's insulin dossage, suggesting that Plaintiff's glycemic control was poor and that he was "quite insulin resistant." (R. at 504.)

On March 10, 2008, Plaintiff was hospitalized at the Pike Community Hospital for nausea, vomiting, and chest pain. (R. at 508.) At this time his blood sugar level was 407 mg/dL. (*Id.*) Plaintiff was transferred to Riverside Methodist Hospital for further treatment. (R. at 509.) On March 12, 2008, Plaintiff's hemoglobin A1C was 9.3%. (R. at 520.) A March 12, 2008

catheterization report reflected non-caridac chest pain.  (R. at 515.)  His discharge diagnoses on

March 13, 2008 included non-cardiac chest pain, nausea and vomiting, and diabetes.  (R. at 516.)

Plaintiff presented to the Pike Community Hospital emergency room again on April 22,

2008 due to abdominal pain, nausea, vomiting, and back pain.  (R. at 450.)  His blood sugar level

at this time was 943 mg/dL.  (R. at 451.)  Upon admission, Plaintiff's physician noted the

possibility of diabetic ketoacidosis with hyperglycemia and a significant risk of metabolic

imbalance.  (R. at 452.)  Plaintiff was treated with an insulin drip as well as medication for his

abdominal pain.  (R. at 460.)  Plaintiff was discharged on April 28, 2008.  (*Id.*)  The attending

physicians diagnoses upon discharge included diabetes mellitus type 2 with diabetic

ketoacidosis; hyperkalemia; and abdominal pain with leukocytosis.  (*Id.*)  Plaintiff returned to

the hospital two day later and was admitted overnight for treatment of dehydration, intractable

nausea and vomiting, uncontrolled diabetes mellitus type II, and hyperglycemia.  (R. at 476–80.)

Plaintiff continued to routinely visit Dr. Schlie from May to July 2008.  (R. at 497–99.)

Dr. Schlie noted that Plaintiff had been recently hospitalized.  (R. at 499.)  Dr. Schlie reported in

June 2008 that an endoscopy revealed gastro-paresis, but showed no evidence of ulcers or

gastritis.  (R. at 498, 502.)   In July 2008,  Dr. Schlie indicated that Plaintiff's diabetes was

"widely variable" and "not perfectly well controlled."  (R. at 497.)

Dr. Lee examined Plaintiff on August 1, 2008.  (R. at 502.)  Dr. Lee noted that Plaintiff

was having hypoglycemic episodes in the afternoon and adjusted his medication.  (R. at 502–03.)

Plaintiff indicated that he was still having intermittent chest pain, but denied shortness of breath.

(R. at 502.)  Dr. Lee saw Plaintiff again in December 2008.  (R. at 528–29.)  She indicated that

his diabetes was "suboptimally controlled although somewhat better."  (R. at 529.)

In March 2009, despite his blood sugar being "up and down," Plaintiff reported to Dr. Schlie that he was "getting along fairly well." (R. at 532.) Although Plaintiff stated that his food intake had remained the same, Dr. Schlie questioned this because Plaintiff had been steadily gaining weight. (R. at 532.) Dr. Schlie, however, did not find any significant change in Plaintiff's condition. (*Id.*)

### 2.  Following April 2, 2009

On April 7, 2009, Plaintiff visited Dr. Lee for treatment of his diabetes. (R. at 524.) At this time, Plaintiff reported blood sugar level readings that were generally within Dr. Lee's target range, with some higher readings before dinner. (*Id.*) Plaintiff reported three episodes of hypoglycemia over the past four months. (*Id.*) Dr. Lee noted that Plaintiff's hemoglobin A1C was 7.9% in March 2009. (*Id.*) Dr. Lee opined at this time that Plaintiff's glycermic control was doing better. (R. at 525.)

In May 2009, Plaintiff visited W. Bradley Strauch, M.D., with complaints of right hand pain, numbness, and tingling. (R. at 547.) An earlier EMG had been consistent with cubital tunnel syndrome. (*Id.*) Dr. Strauch diagnosed Plaintiff with right cubital tunnel syndrome, right medial epicondylitis, and right lateral epicondylitis. (*Id.*) Dr. Strauch recommended an elbow sleeve as well as injections. (*Id.*) Upon follow-up examination, Plaintiff reported that injections had resolved his pain for approximately three months. (R. at 546.) Plaintiff indicated that he continued to have pain and weakness with gripping objects, but that his tingling and numbness had improved. (*Id.*) Plaintiff had not purchased an elbow strap due to insurance concerns. (*Id.*)

On May 26, 2009, Plaintiff reported to cardiologist S. B. Patel, M.D., for examination. (R. at 541–42.) Plaintiff noted that since his original angioplasty, he had experienced episodes

of chest discomfort, which he described as a dull ache.  (R. at 541.)  Plaintiff indicated that this chest discomfort had become more frequent lately.  (*Id.*)  Plaintiff also complained of associated diaphoresis but no shortness of breath, palpitations, lightheadedness or syncope.  (*Id.*)  Because of Plaintiff's recurrent chest pain, Dr. Patel recommended a stress test.  (R. at 542.)  Upon follow-up examination, Dr. Patel noted that Plaintiff's stress test was negative for myocardial ischemia.  (R. at 535.)  In response to Plaintiff's complaints of fatigue, Dr. Patel adjusted his medication.  (*Id.*)

Plaintiff continued to see Drs. Schlie and Lee for treatment from June 2009 through at least September 2009.  In July 2009, Dr. Schlie wrote on a prescription pad that Plaintiff was unable to work, and that he expected Plaintiff's disability to last at least one year.  (R. at 545.)  On August 11, 2009, Dr. Lee found that Plaintiff's blood sugar numbers were "under fairly good control," despite the fact that Plaintiff's diet had been inconsistent.  (R. at 550.)  She further recognized that Plaintiff's ophthalmology appointment, which had occurred earlier in the summer, was unremarkable.  (R. at 551.)  Although Plaintiff's most recent hemoglobin A1C was still above target level, it was down to 7.5%.  (*Id.*)  Finally, on September 21, 2009, Dr. Schlie saw Plaintiff.  (R. at 543.)  Her records reflect that an earlier examination of Plaintiff's foot had been normal.  (*Id.*)  Dr. Schlie noted that Plaintiff was only eating meals twice a day, and, therefore, was only taking certain medication twice a day.  (*Id.*)  Dr. Schlie indicated that, on the day of the examination, Plaintiff's diabetes did not appear well controlled.  (*Id.*)

**B.     State Agency Evaluations**

In November 2007, state agency physician, Myung Cho, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 388–95.)  Dr. Cho opined that Plaintiff

10

could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; sit for about six hours in a workday; and push and pull within normal limits.  (R. at 389.)  Dr. Cho stressed that the objective evidence showed that Plaintiff's diabetes was noted to be under poor control due to noncompliance.  (*Id.*)  Dr. Cho observed that Plaintiff should never climb ladders, ropes or scaffolds.  (R. at 390.)  Dr. Cho found that Plaintiff's statement were credible in nature but not in severity.  (R. at 393.)  In March 2008, state agency physician, Maria Congbalay, M.D., affirmed Dr. Cho's assessment.  (R. at 449.)

### IV. EXPERT TESTIMONY

**A.    Medical Experts**

**1.    Stanton Fischer, M.D.**

Stanton Fischer, M.D., certified as a general internist and pulmonologist, testified as the medical expert at the November 5, 2009 administrative hearing.  (R. at 12–24.)  Dr. Fischer noted that Plaintiff's impairments did not equal or meet the listing requirements.  (R. at 13–15.)  With regard to Plaintiff's coronary artery disease, Dr. Fischer summarized that Plaintiff had a heart catherization in February 2006.  (R. at 12.)  Dr. Fischer noted upon discharge in February 2006 Plaintiff's ejection fraction was fifty percent, which he classified as satisfactory.  (R. at 13.)  Dr. Fischer further highlighted that Plaintiff's ejection fraction was seventy-three percent in June 2009, which he characterized as excellent.  (*Id.*)  Accordingly, Dr. Fisher opined that Plaintiff's coronary artery disease was stable.  (R. at 15.)

Dr. Fischer testified that Plaintiff "had very poor control of his diabetes." (R. at 13.)  Dr. Fischer noted that Plaintiff had episodes of acidosis, requiring hospitalization, in conjunction with kidney problems.  (*Id.*)  He later implied that Plaintiff's kidney problems exacerbated his

diabetes on these occasions.  (R. at 17.)  He indicated, however, that at least as of September

2009, Plaintiff's kidney functions had improved.  (R. at 14.)  Dr. Fischer further noted that in

September 2009, Plaintiff's sugar levels were still high.  (*Id.*)  He found it difficult to say why

Plaintiff's diabetes was not controlled, opining that it might be because Plaintiff failed to follow

up with his medical care.  (R. at 15.)

As to Plaintiff's physical capacity, Dr. Fischer indicated that Plaintiff would be capable

of light work.  (R. at 19.)  Dr. Fischer further opined that Plaintiff should not climb ropes,

ladders, or scaffold.  (*Id.*)  Additionally, Dr. Fischer concluded that Plaintiff should not crawl,

should not be exposed to extreme outside weather, and should not be forced to work at

unprotected heights or with dangerous machinery.  (*Id.*)

### 2. Robert Smiley, M.D.

Robert Smiley, M.D., testified as the medical expert at the April 29, 2010 administrative

hearing.  (R. at 47–52.)  Dr. Smiley opined that Plaintiff's diabetes was reasonably well

controlled on his current medication regimen.  (R. at 47.)  Dr. Smiley testified that Plaintiff's

impairments did not meet or equal the listing requirements.  (R. at 50.)  He opined that Plaintiff

could do light level work with a sit/stand option.  (R. at 50, 52–53.)  He explained that none of

Plaintiff's documented impairments accounted for Plaintiff's alleged difficulties with standing or

sitting.  (R. at 50.)  Dr. Smiley acknowledged that Plaintiff had peripheral neuropathy related to

his diabetes, but that there was no evidence that this condition prevented him from working at

the light level.  (R. at 51.)  He further explained that Plaintiff's complaints of fatigue were likely

the result of deconditioning.  (R. at 52.)

**B.      Vocational Expert**

**1.      Cecile Johnson**

Cecile Johnson testified at the first administrative hearing as a vocational expert.  (R. at 25–28.)  Ms. Johnson classified Plaintiff's past work as labor type jobs at the medium, unskilled level.  (R. at 25.)  She further noted that Plaintiff had not met substantial gainful activity levels since 2001.  (*Id.*)

The ALJ asked Ms. Johnson to consider a person of Plaintiff's age, education, and past work experience, with a limited education, and a marginal ability to read and write.  (R. at 25–26.)  The ALJ further provided that such a person could stand and walk six hours in an eight hour day, and lift and carry 10 pounds occasionally and less than that frequently.  (R. at 26.)  He could occasionally crouch, kneel, balance, and climb stairs, but could not crawl.  (*Id.*)  He should not be exposed to dust, fumes, gases, or uncontrolled climate conditions outdoors.  (*Id.*)  He would be limited to understanding, remembering, and carrying out short, simple instructions and would have slight problems maintaining attention and concentration for more than simple instructions.  (*Id.*)  Ms. Johnson acknowledged that such a person could not perform Plaintiff's past relevant work, but could perform some entry level sedentary unskilled jobs, such as a final assembler, optical goods worker and surveillance monitor.  (R. at 26–27.)

Counsel asked Ms. Johnson to consider the additional limitation that, because of fatigue, he would be required to take two unscheduled five minute breaks during the day.  (R. at 28.)  Ms. Johnson responded that any such unscheduled breaks would "cause an effect in employability."  (*Id.*)

## 2.    Norman Hooge

Norman Hooge testified at the second administrative hearing as a vocational expert.  (R. at 54–58.)  The ALJ asked Dr. Hooge to consider a person of Plaintiff's age and limited education, who could lift and carry 20 pounds occasionally and 10 pounds frequently, sit for six hours in an eight hour day, and stand and walk four to six hours in an eight hour day with a sit/stand option every hour.  (R. at 55–56.)  The ALJ also limited this person to simple one to three step tasks.  (R. at 56.)  Dr. Hooge testified that such an individual could not perform any of Plaintiff's past work, but could perform unskilled light work, such as a courier messenger, delivery person, or parking lot attendant.  (*Id.*)

## V.  ADMINISTRATIVE DECISION

On May 28, 2010, the ALJ issued his decision.  (R. at 68–88.)  The ALJ first found that Plaintiff had not engaged in substantial gainful activity since January 14, 2002, his alleged disability onset date.  (R. at 72.)

Next, the ALJ found that since the alleged onset date of disability, January 14, 2002, Plaintiff has had the following severe impairments: diabetes mellitus, borderline intellectual functioning, coronary artery disease, hypertension, and depression.  (*Id.*)  The ALJ concluded that beginning on February 1, 2006, Plaintiff also had the severe impairment of ulnar nerve entrapment.  (*Id.*)

The ALJ then found that prior to February 1, 2006, Plaintiff had the ability to perform a reduced range of light work, could perform a significant number of jobs in the national economy, and was, therefore, not disabled within the meaning of the Social Security Act.[3]  (R. at 75–83.)

_____

[3]  Plaintiff does not challenge this unfavorable finding of the ALJ.

14

From February 1, 2006 through April 1, 2009, however, the ALJ found that Plaintiff's

residual functional capacity ("RFC") was reduced as follows:

> [T]he claimant had the [RFC] to perform sedentary work . . . except the claimant was
> able to sit for 4 hours in an 8 hour day; he was able to stand or walk for 2 hours
> in an 8 hour day; he required the option to change positions at will at least every hour;
> he could lift or carry 10 pounds occasionally or frequently; he could perform only
> simple, 1 to 3 step tasks in a routine work environment; and he was able to read,
> write, add and subtract.

(R. at 79.)  In reaching this finding the ALJ noted that Plaintiff had been hospitalized three times

between November 2007 and May 2008 for various conditions including diabetic ketoacidosis.

(R. at 80.)  The ALJ suggested that the opinions of Dr. Schlie, as well as the medical experts,

supported this finding.  (R. at 81–82.)  In light of this assigned RFC, the ALJ found that jobs did

not exist in significant numbers that Plaintiff could perform.  (R. at 84.)  Accordingly, the ALJ

concluded that Plaintiff was disabled from February 1, 2006 through April 1, 2009.  (R. at 84.)

The ALJ next determined that medical improvement occurred as of April 2, 2009.  (R. at

84.)  The ALJ stressed that Plaintiff's diabetes had come under control at this time and that he

received no further hospitalizations for his cardiac condition.  (*Id.*)  The ALJ found that

beginning on April 2, 2009, Plaintiff has not had an impairment or combination of impairments

that meets or medically equals one of the listed impairments, and that Plaintiff had the RFC to

perform a reduced range of light work.  (R. at 84–85.)  The ALJ assigned the following

limitations to Plaintiff's ability to perform light work:

> [The claimant] can sit for 6 hours in an 8 hour day; he can stand or walk for 4 hours
> in an 8 hour day; he requires the option to change positions at will at least every
> hour; he can lift or carry 20 pounds occasionally and 10 pounds frequently; he can
> perform only simple, 1 to 3 step tasks in a routine work environment; and he is able
> to read, write, add and subtract.

(R. at 85.)  The ALJ based this assessment on the treatment notes of Dr. Lee as well as the

15

opinion evidence of Drs. Fischer and Smiley.  (R. at 86.)  The ALJ gave the July 2009 disability

opinion of Dr. Schlie no significant weight.  (*Id.*)

The ALJ determined that on April 2, 2009, even though Plaintiff was unable to perform

his past relevant work, he was capable of performing a significant number of jobs in the national

economy.  (R. at 87–88.)  The ALJ therefore concluded that Plaintiff's disability ended on April

2, 2009.  (R. at 88.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there

is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

### A.    New Evidence

Before considering whether the ALJ erred in finding medical improvement, the Court must consider the scope of the record.  Within his briefing, Plaintiff attempts to incorporate new evidence that was not before the ALJ.  Plaintiff frequently references evidence indicating that he was hospitalized in November 2009 for diabetic ketoacidosis.  (R. at 554–57.)  The record reflects, however, that Plaintiff submitted this evidence to the Appeals Council after the ALJ's decision.  (R. at 4.)

As the Sixth Circuit "has repeatedly held[,] . . . evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Pursuant to sentence six of § 405(g) a Court may remand a case for consideration of new evidence, but only "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .  42 U.S.C. § 405(g).

17

In this case, because the evidence of Plaintiff's November 2009 hospitalization was not submitted to the ALJ, the Court cannot consider it in performing substantial evidence review. Accordingly, the undersigned will not consider this evidence in evaluating the ALJ's decision. Furthermore, the undersigned finds insufficient grounds for a sentence six remand. Plaintiff has failed to request such a remand and has also failed to meet the good-cause requirement embedded in 42 U.S.C. § 405(g), particularly because the records were available to him prior to the 2010 hearing.

**B.      Medical Improvement**

Within his Statement of Errors, Plaintiff contends that the ALJ erred in finding medical improvement after April 2, 2009. Plaintiff also challenges the ALJ's determination that the medical improvement increased Plaintiff's ability to work.

In cases such as this one, in which an ALJ awards a closed period of benefits, an ALJ "must find a medical improvement in the claimant's condition to end his [or her] benefits, a finding that requires 'substantial evidence' of a 'medical improvement' and proof that he [or she] is 'now able to engage in substantial gainful activity.'" *Niemasz v. Barnhart*, 155 F. App'x 836, 840 (6th Cir. 2005) (quoting 42 U.S.C. § 423(f)(1)). Furthermore, the medical improvement must be related to the ability to work. *McNeal v. Comm'r of Soc. Sec.*, No. 3:11–cv–161, 2012 WL 748834, at *8 (S.D. Ohio Mar. 7, 2012). Despite this approach, however, "there is no presumption of continuing disability." *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007) (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286–87 n. 1 (6th Cir. 1994)).

In 20 C.F.R. §§ 404.1594 and 416.944, the Regulations outline the process for considering medical improvement and whether a claimant's disability period has ended. The

18

United States Court of Appeals for the Sixth Circuit has described medical improvement as follows:

> The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.* And a medical improvement is related to an individual's ability to work only "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities . . ." 20 C.F.R. § 404.1594(b)(3). *See also Nierzwick v. Commissioner of Social Security*, 7 Fed. Appx. 358 (6th Cir. 2001).

*Kennedy*, 247 F. App'x at 764–65. In other terms medical improvement "is determined by a comparison of prior and current medical evidence . . . ." 20 C.F.R. §§ 404.1594(c)(1), 416.994(b)(2)(i). If medical improvement occurs, the ALJ will then conduct a new RFC assessment and compare that assessment to the prior RFC to determine if the medical improvement is related to a claimant's ability to work. *Id.* "Unless an increase in the current residual functional capacity is based on changes in the signs, symptoms, or laboratory findings, any medical improvement that has occurred will not be considered to be related to [the claimant's] ability to do work." *Id.* The Regulations further provide that "[a] decrease in the severity of an impairment as measured by changes (improvement) in symptoms, signs or laboratory findings can, if great enough, result in an increase in the functional capacity to do work activities." 20 C.F.R. §§ 404.1594(b)(4)(i), 416.994(b)(iv)(A).

Here, the undersigned finds that substantial evidence supports the ALJ's medical improvement decisions. First, based on a comparison of the medical evidence, the ALJ was reasonable in concluding that Plaintiff's conditions improved after April 1, 2009. Plaintiff was

admitted to the hospital in January 2006 due to a myocardial infarction.  Prior to April 1, 2009,

Drs. Schlie and Lee, routinely opined that Plaintiff's diabetes was poorly controlled.  Treatment

records reflect that during this period Plaintiff experienced frequent fluctuations in blood sugar

and high hemoglobin A1C levels.  Furthermore, from February 2006 through May 2009,

Plaintiff was hospitalized on several occasions due to chest pain and diabetic ketoacidosis.

After April 1, 2009, much of the medical evidence indicates that Plaintiff's conditions

improved.  First, the treatment notes of Dr. Lee, Plaintiff's treating endocrinologist, reflect

improvement in Plaintiff's diabetic condition during this time frame.[4]  On April 7, 2009, Plaintiff

reported that his blood sugar numbers were within the target ranges in the mornings and before

lunch, with some higher readings, in the 200s, before dinner.  (R. at 524.)  Plaintiff noted that he

had only three episodes of hypoglycemia within the past four months.  (*Id.*)  Based on this

information, Dr. Lee's notes reflect that Plaintiff's blood sugar control was doing better.  (*Id.*)

She also noted that Plaintiff's hemoglobin A1C had improved at this time.  (*Id.*)  In August 2009,

Plaintiff stated to Dr. Lee that he had a few recent episodes of hypoglycemia, but admitted that

he had not been eating much for lunch.  (R. at 550.)  Plaintiff denied any readings over 200 and

his most recent  hemoglobin AC1 was down to 7.5%.  (*Id.*)  Overall, Dr. Lee opined that

Plaintiff's blood sugar numbers were "under fairly good control."  (R. at 550.)  Additionally,

treatment records reflect that ophthalmology and foot examinations in the summer of 2009 had

yielded normal findings.  (R. at 543, 551.)

Testimony from the medical experts also suggests improvement to Plaintiff's conditions

---

[4]  Dr. Lee's notes also reflect that Plaintiff's diabetic condition, although not optimal, was
improving in December 2008.  (*See* R. at 529.)

during the relevant period.  With regard to Plaintiff's heart condition, Dr. Fischer testified that while Plaintiff's ejection fraction was satisfactory following hospitalization in 2006, ejection fraction results from a June 2009 stress test were excellent.  (R. at 13.)  Although Dr. Fischer testified that Plaintiff's diabetes was poorly controlled, he also suggested that Plaintiff's kidney problems, which he implied had contributed to Plaintiff's periods of hospitalization, had improved by September 2009.  (*See* R. at 14–15, 17.)  Furthermore, at the April 2010 administrative hearing, Dr. Smiley opined that Plaintiff's diabetes was "reasonably well controlled on his current insulin regimen."  (R. at 47.)  Finally, in addition to Dr. Lee's treatment notes and the medical expert testimony, the record before the ALJ contained no evidence of further hospitalization for Plaintiff's diabetes and heart conditions following April 1, 2009, providing another reason to infer that Plaintiff's conditions had improved.[5]

The undersigned recognizes, in considering medical improvement, that in September 2009 Dr. Schlie indicated that Plaintiff's blood sugar was not well controlled on the day of her examination.  (R. at 543.)  At the same time, however, Dr. Schlie recognized that Dr. Lee's recent treatment notes had reflected that she was generally satisfied with Plaintiff's blood sugar levels.  (*Id.*)  Dr. Schlie also noted that Plaintiff had been eating just two meals a day, and, therefore, only taking his coverage medication twice a day.  (*Id.*)  Ultimately, this evidence is simply not strong enough, in light of the indications of improvement outlined above, to make the

---

[5]  Although Plaintiff's elbow problem does not appear to be a focus of his disability claim, the record also reflects that Plaintiff's elbow condition responded to injections in May 2009.  (R. at 546.)

ALJ's medical improvement determination unreasonable.[6]

In addition to finding medical improvement, the ALJ also found that such improvement was related to Plaintiff's ability to perform work.  Despite various medical opinions suggesting that Plaintiff could perform light work, the ALJ restricted Plaintiff to sedentary work from February 1, 2006 to April 1, 2009.  The ALJ's RFC determination for this period emphasized the instability of Plaintiff's diabetic condition at this time as well as the frequent hospitalizations for his diabetic and heart conditions.  (*See* R. at 80–81.)  After finding medical improvement, the ALJ evaluated Plaintiff's RFC after April 1, 2009, and found that Plaintiff was capable of a reduced range of light work.

Substantial evidence supports the ALJ's finding that Plaintiff's medical improvement was related to his ability to work.  More specifically, the ALJ was reasonable in concluding that Plaintiff's RFC increased to light work beginning on April 2, 2009.  As detailed above, the record evidence reflects that Plaintiff's conditions improved after April 1, 2009.  Furthermore, Drs. Congbalay, Cho, Fischer, and Smiley all issued medical opinions suggesting that Plaintiff was capable of a reduced range of light work.  Although the ALJ chose to assign a more restrictive RFC during the period when the medical evidence reflected that Plaintiff's conditions were at their worst, such a finding did not preclude the ALJ from considering these medical opinions after finding that medical improvement had occurred.  Ultimately, when combining the evidence of medical improvement with the various medical opinions in this case, the ALJ was

---

[6]  This does not mean that the ALJ could not have reached a different conclusion from this evidence.  *See Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal quotations omitted).

justified in inferring that beginning on April 2, 2009, Plaintiff's conditions had improved to a point where he could perform a reduced range of light work.[7]

## VIII.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

---

[7]  Furthermore, the ALJ did not err in rejecting the July 2009 disability opinion of Dr. Schlie.  Dr. Schlie offered no justification for this opinion nor did he assign any specific functional restrictions.  Furthermore, the ultimate determination of disability is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).

magistrate judge's report and recommendation).  Even when timely objections are filed, appellate

review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 7, 2012                                      */s/ Elizabeth A. Preston Deavers*
                                                         Elizabeth A. Preston Deavers
                                                         United States Magistrate Judge